1  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   SUSAN K. LEADER (SBN 216743)
2  ALI R. RABBANI (SBN 253730)
   JOSHUA A. RUBIN (SBN 308421)
3  sleader@akingump.com
   arabbani@akingump.com
4  rubinj@akingump.com
   1999 Avenue of the Stars, Suite 600
5  Los Angeles, CA 90067-6022
   Telephone:  310.229.1000
6  Facsimile:  310.229.1001

7  Attorneys for Plaintiffs

8

9            UNITED STATES DISTRICT COURT

10       FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12 | BYD COMPANY LTD and GLOBAL HEALTHCARE PRODUCT SOLUTIONS, LLC, | Case No.:  2:20-cv-5530 |
13 | | **COMPLAINT FOR:** |
14 | Plaintiffs, | 1. **UNFAIR COMPETITION, FALSE ENDORSEMENT, FALSE ASSOCIATION, AND FALSE DESIGNATION OF ORIGIN (LANHAM ACT)** |
15 | v. | |
16 | ALEXANDER KHAZAI, AARON ARREDONDO, JAMES VAUGHN, DRIPSTONE LLC, ROBERTO BANKE, and DOES 1-10, | 2. **TRADEMARK DILUTION (LANHAM ACT)** |
17 | | 3. **FALSE ADVERTISING (LANHAM ACT)** |
18 | Defendants. | 4. **TRADEMARK DILUTION, (CAL. BUS. PROF. CODE §§ 14247)** |
19 | | 5. **UNFAIR COMPETITION, (CAL. BUS. PROF. CODE §§ 17200)** |
20 | | 6. **FALSE ADVERTISING, (CAL. BUS. PROF. CODE §§ 17500)** |
21 | | 7. **UNFAIR COMPETITION AND TRADEMARK INFRINGEMENT** |
22 | | |
23 | | **DEMAND FOR JURY TRIAL** |

Plaintiffs BYD Company Ltd and Global Healthcare Product Solutions, LLC ("BYD Global" and, collectively with BYD Company Ltd, "BYD") allege as follows against Defendants as well as any presently unknown pseudonyms, affiliated entities, or persons acting in concert with Defendants ("Does 1 – 10"):

## SUMMARY OF THE ACTION

1.      This lawsuit is brought by BYD to combat the exploitation of consumers during the COVID-19 global pandemic.  Defendants are operating an illegal scheme to advertise and sell counterfeit BYD N95 respirator masks to unwitting buyers, who believe that they are receiving authentic BYD masks that are safe, effective, and certified by U.S. and international regulators.  These buyers are often state and local governments, hospitals, and nonprofit organizations.  Tragically, these counterfeit and often defective masks are then distributed to doctors, nurses, first responders, and others on the front line of the COVID-19 battle, exposing these heroes to increased risk of infection.

2.      Although BYD—which stands for "Build Your Dreams"—has become a household name based on its cutting-edge work in the renewable energy and electric car space, in early 2020 following the pandemic outbreak, the company devoted its resources to manufacturing respirator masks and other healthcare and medical devices to address severe worldwide shortages.  BYD formed BYD Global to sell these products in North America, and quickly began working with state and local governments, including the state of California, to supply their hospitals and first responders with high quality BYD N95 respirator masks.  BYD is now the single largest manufacturer of respirator masks in the world, manufacturing 50 million masks per day.  BYD sells these products under their well-known "BYD" and "BYD Care" trademarks.

3.      The unprecedented demand and insufficient supply of safe and certified respirator masks has led some bad actors to exploit the desperation of the public for their own monetary gain by selling counterfeit masks that are falsely marked and designated as BYD-produced and certified.  Not only do Defendants represent to the

customers that these are authentic BYD N95 respirator masks, but the masks are contained in packaging affixed with BYD's logos and trademarks. By design, these measures trick consumers and the public into believing that they are purchasing safe, effective, and certified respirator masks, when in reality they are counterfeits. Defendants know the dire need for respirator masks and other healthcare products to safeguard the health of the American public and exploit it for their own financial gain.

4. While anti-counterfeiting laws are often applied in the context of luxury goods, the consequences here are far more serious. BYD's concern is not monetary in nature. Rather, BYD's concern is that these counterfeit masks have not gone through the rigorous quality-control and regulatory approval process associated with masks manufactured by BYD. When Defendants falsely advertise the N95 respirator masks as being manufactured by BYD, they are deceiving the customers into believing that the masks will function to the specifications required by the government to protect the person ultimately wearing the mask from contracting COVID-19. When these masks are counterfeit, the consequences can literally be deadly.

5. BYD will not condone bad actors using BYD's brand recognition and trademarks to deceive and harm the public. This lawsuit is merely the most recent in a series of efforts that BYD has taken to fight back against the scourge of counterfeiting that is unfortunately all too common. In addition to warning customers of the threat of counterfeiting and how to avoid it, BYD is working with law enforcement to investigate and hold responsible parties criminally liable.

6. BYD has filed this suit to shut down this unlawful activity, protect consumers from serious harm, and protect its name and brands from being associated with Defendants' unlawful and unethical efforts to profiteer from the pandemic at the expense of our healthcare workers and the general public. Any damages awarded in this case will be donated by BYD to charitable COVID-19 relief efforts.

## THE PARTIES

7.     Plaintiff BYD Company Ltd is a publicly-traded company based in Shenzhen, China.  BYD provides renewable energy, clean transportation, and design and manufacturing services

8.     Plaintiff Global Healthcare Product Solutions, LLC ("BYD Global") is a Delaware Limited Liability Company based in Los Angeles, California.  BYD Global is a wholly owned subsidiary of BYD Company Ltd.  Formed in 2020 in response to the global COVID-19 pandemic, Global Healthcare is the exclusive seller of BYD's healthcare products in North America.

9.     On information and belief, Defendant Alexander Khazai is a natural person who resides, is domiciled, and conducts business in Los Angeles, California or San Diego, California.

10.     On information and belief, Defendant Aaron Arredondo is a natural person who resides, is domiciled, and conducts business in Los Angeles, California or Orange County, California.

11.     On information and belief, Defendant James Vaughn is a natural person who resides and is domiciled in the state of New York, and who conducts business in Los Angeles, California.  Vaughn's conduct which forms the basis for this complaint was transacted in Los Angeles, California.

12.     On information and belief, Dripstone LLC is a California limited liability company with its principal place of business in Los Angeles, California.

13.     On information and belief, Roberto Banke is a natural person who resides, is domiciled, and conducts business in Orange County, California.

14.     Plaintiffs are ignorant of the true names of the Defendants sued as Does 1-10, and such names are fictitious.  Plaintiffs will amend the complaint to sue the Doe Defendants in their true names as soon as Plaintiffs obtains sufficient information to do so.

## **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the subject matter of this complaint under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1367, and 1338(a).  The claims for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, respectively, asserted in Counts I – III arise under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.* Accordingly, this Court has original and subject matter jurisdiction over Counts I – III pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C § 1121(a).

16.     The claims for unlawful, unfair, and fraudulent business acts or practices and false advertising in violation of California Business and Professions Code §§ 17200 *et seq.* and 17500 *et seq.*, trademark dilution, unfair competition, and trademark infringement, asserted in Counts IV – VII, arise under California statutory and common law, and are substantial and so related to the federal claims asserted in Counts I – III that they form part of the same case or controversy.  Accordingly, this Court has supplemental jurisdiction over Counts IV – VII pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

17.     The conduct alleged in this Complaint occurred in interstate commerce, and has substantially affected and will continue to substantially and directly affect interstate commerce.

18.     The Court has personal jurisdiction over Defendants because Defendants either reside and are domiciled in the state of California, or else have purposefully availed themselves of the benefits of transacting business in the state of California, and have committed and intentionally directed tortious conduct towards residents of the state of California.

19.     Venue is proper in this district because a substantial part of the events giving rise to the claims asserted occurred in this district and because Defendants are subject to personal jurisdiction in this district.  Venue is thus proper pursuant to 28 U.S.C. §§ 1391(b)(2) and (b)(3).

## GENERAL ALLEGATIONS

### A.  BYD and Global Healthcare

#### *BYD*

20.     BYD—which stands for "Build Your Dreams"—was founded in 1995 in a small office in Shenzhen, China.  Since its humble beginnings, the company has quickly grown into an international organization, with over 200,000 employees globally in over 200 offices and campuses on every continent except Antarctica.

21.     BYD has traditionally focused on renewable energies and clean transportation, and is the world's leading electric vehicle company.  BYD has been recognized by international publications and organizations as a pioneer in renewable and clean energy, including (i) Fortune Magazine's list of companies that are changing the world; (ii) the Sustainia Award for Top 10 Global Innovator in Clean Tech; (ii) the United Nation's Award of Special Recognition for Powering the Future We Want; (iv) the Zayed Future Energy Prize for Sustainability; and, (v) one of Fast Company's 2018 Most Innovative Companies.

#### *BYD's Response to the COVID-19 Pandemic and Creation of Global Healthcare*

22.     In early 2020, in response to the outbreak of the COVID-19 global pandemic, BYD made the decision to leverage its unparalleled infrastructure and production capabilities in order to manufacture healthcare products to support the battle against the pandemic.  The company immediately deployed its team of 3,000 engineers to quickly develop and mass produce virus-combatting healthcare products and personal protective equipment ("PPE"), including high quality protective face masks, surgical masks, respirators, hand sanitizers, and contactless infrared thermometers.

23.     Although they are sometimes referred to generally as "masks," there are varying categories of protective medical face coverings that BYD produces and which can be worn to slow the transmittal of COVID-19.  The most protective and highly-regulated coverings are referred to as "respirators" or "respirator masks."  These masks

are designed to form a tight seal over the mouth and nose and to keep out almost all air particles.  One class of respirator masks are N95 masks, which are highly regulated and are required to filter at least 95% of airborne particles.  The next level down in terms of protection are "surgical masks," which are required to be certified as ASTM Level 2. Finally, masks that do not meet the ASTM Level 2 requirements to be surgical masks are simply referred to as "masks."

24.   BYD's production of respirator masks and surgical masks, including N95 respirator masks, addressed a vital public need.  The unprecedented influx of public demand for these masks quickly outpaced the supply from traditional producers of N95 masks such as 3M, and governments, hospitals, and other bulk-buyers of masks and respirators were left with nowhere to turn for these life-saving PPE products.

25.   By quickly pivoting to the production of high-quality, safe, and effective masks, BYD filled this production gap and began selling directly to states to meet this demand.  Currently, BYD is the world's largest producer of high quality and certified protective respirator masks, with the industry-leading ability to make 50 million masks per day.  In March 2020, BYD formed a wholly owned subsidiary BYD Global.  BYD Global is the exclusive authorized licensee of BYD's trademarks in North America, and is tasked with selling BYD's masks, respirators, and other healthcare products.

26.   In April 2020, BYD reached a deal with the state of California to provide it with 150 million respirator and surgical masks per month—mostly N95 respirator masks—which would be used by healthcare providers and first responders.  BYD reached similar deals with governments in other states.

27.   Because these respirator masks are often used by people interacting closely with those infected by the virus, the efficacy of these products is paramount.  Over the past several months, BYD has worked around the clock to seek approval and certification from domestic and international regulatory agencies, including the U.S. Federal Drug Administration ("FDA"), the U.S. National Institute for Occupational Safety and Health ("NIOSH"), CE in the European Union, the Australian Register of

Therapeutic Goods, and others.  In addition to achieving these approvals and certifications, BYD also imposes rigorous internal testing processes on its masks to ensure that the masks are safe and effective.

### *BYD's Trademarks*

28.    Over the past quarter century, BYD has invested millions not only in developing its products and technology, but in promoting its brand to customers globally.  It has done so in part through its "BYD" marks and "BYD" logo registered in the United States Patent and Trademark Office.

29.    Since pivoting to the production of respirator masks and other healthcare and PPE products in early 2020 to respond to the COVID-19 pandemic, BYD has made efforts to protect its trademarks with respect to its masks and other protective healthcare equipment.  In selling these devices, BYD has used its BYD mark and logo, along with its "BYD Care" mark and logo, as seen below.




30.    BYD uses these trademarks in commerce to distinguish its N95 respirator masks and surgical masks and PPE from others sold, and to indicate and signal the source of these masks and PPE.

31.    BYD has applied for additional registrations for its BYD and BYD Care marks for respirator and surgical masks and other PPE on an intent-to-use ("ITU") basis as reflected in (i) U.S. ITU Trademark Application Serial No. 88/840,575, which covers the BYD mark in standard characters for protective gear for medical use, namely, masks, gloves, clothing items, hand sanitizers and medical thermometers; (ii) U.S. ITU

Trademark Application Serial No. 88/840,620, which covers the BYD Care mark in standard characters for the same products; and (iii) U.S. ITU Trademark Application Serial No. 88/840,648, which covers the BYD Care mark in standard characters for the same products. These applications were all made on March 19, 2020 and are currently pending.

32. Since BYD made news through its decision to begin supplying respirator and surgical masks, media outlets have routinely used BYD's various marks in articles and news coverage, as seen in the below example. This news coverage further leads consumers to associate the BYD marks with BYD, and to recognize the marks as identifying BYD as the exclusive source of the respirator masks and other healthcare products offered under those marks. BYD's "BYD" and "BYD Care" marks signify to consumers that the BYD-brand products offered under the BYD marks are of the highest quality and adhere to the strictest quality-control standards.



33. Moreover, BYD's efforts to obtain NIOSH certification for its N95 respirator masks have been well-publicized. NIOSH certification was a condition of BYD's contract with the state of California, and BYD's securing of the certification on June 7 made headlines in numerous publications, including the Los Angeles Times and Wall Street Journal.

34. Because of these widespread publications, consumers associate BYD respirator masks with the stringent specifications required of NIOSH. Consumers are also aware that BYD subjects its surgical and respirator masks to industry-leading

internal testing and quality control, and associates BYD's marks with that rigorous testing.  At a time where healthcare providers and first responders are exposing themselves to significant risk as the front lines in the battle against COVID-19, consumers now more than ever rely on the BYD marks as a signal of quality, safety, and efficacy.

### B. The Palming Off of Cheap Knock-Offs as N95 Respirator Masks

35.     Although the COVID-19 pandemic has revealed the generosity and heroics of many in our society—from doctors and nurses to grocery store workers—a disturbing number of criminals have seized on the pandemic as an opportunity to make a quick buck at the expense of the public health.  Exploiting the dearth of N95 respirator masks and surging demand, companies and individuals almost immediately began to exploit this market imbalance by creating what appear to be N95 respirator masks, but in many cases do not in fact have the filtering and protective effect of an authentic N95 mask.

36.     Even worse, these scammers soon realized their "N95 masks" would sell better if they were branded with the marks and logos of reputable respirator mask producers, including BYD.  These companies and individuals hope to deceive purchasers—many of whom are governments and organizations purchasing masks on behalf of hospitals, law enforcement, and firefighters—into believing that the masks are of the high quality denoted by the BYD marks.  Governments rely on the apparent marks and logos on these counterfeit goods and believe that the purchased respirator masks have been certified by NIOSH and will keep their users safe.  When it turns out that the masks are in reality cheap knock-offs, it is often too late, as these masks are in circulation and are failing to protect those on the front line of the COVID-19 battle.

37.     As early as February 2020, reports began coming out of China of hundreds of instances of fake respirator mask production, leading to over 1,500 hundred arrests.  In early April, CNN reported that a hospital in New Jersey—which was treating and testing hundreds of patients—purchased 1,000 N95 masks that turned out to be counterfeit.  CNN likewise reported that product sourcing firms (who procure masks on

behalf of hospitals and other medical providers) had reported suspicious calls from "brokers" purporting to have millions of masks from a reputable manufacturer.

38.   In May, Fortune reported that *millions* of counterfeit respirator masks had made their ways into hospitals from a manufacturer in China.  Although these masks were labeled and stamped as if they were NIOSH certified, an examination revealed that they did not meet the certification of a NIOSH-approved N95 mask, and are considered by experts to be medically inadequate.  The report noted that the state of West Virginia had distributed these counterfeit masks to thousands of paramedics and firefighters, prison guards and hospital workers.

39.   There is no question that the sale and use of counterfeit N95 respirator masks has increased contraction rates among healthcare providers and first responders, and has almost certainly increased the number of deaths from the virus.

40.   BYD has been on the forefront of the effort to raise public awareness of the problem of counterfeiting and the public health risk it poses.  In May, BYD issued a press release in which it "warn[ed] its customers to be wary of counterfeit products posing as Personal Protective Equipment manufactured by BYD Precision Electronics." The press release educated its customers that BYD products are "sold exclusively" by BYD Global "and no one else."  The press release provided customers with contact information in the event they had any questions or concerns about the authenticity of their BYD masks.  BYD has likewise been working closely with law enforcement to investigate and prosecute producers and distributors of counterfeit masks.

41.   As explained in more detail below, despite the vigilance of law enforcement, customs control, and companies like BYD, consumers have continued to be victimized by increasingly-savvy counterfeiters who are able to produce knock-offs that are nearly indistinguishable in packaged form from authentic and certified N95 respirator masks.

### C. Defendants' Unlawful Conduct

42.    BYD's N95 respirator masks in particular have been the target of a flurry of counterfeiting activity.  As explained in more detail below, BYD's customers have reported suspicious activity from individuals professing to have hundreds of thousands or even millions of "BYD masks."  These individuals send the customers pictures and videos of thousands of boxes of masks, all bearing BYD's trademarks and logos.  In reality, however, these masks are fakes.

43.    Not only were they not manufactured by, or purchased from, BYD, but BYD has no way to confirm that these masks are safe for use, or that they conform to the rigorous specifications of NIOSH or other regulatory bodies.  As described above, N95 respirator masks have certain specifications they must meet in order to be marketed and sold as N95 respirator masks.  When individuals manufacture counterfeit BYD "N95 masks," there is no assurance these masks meet these rigorous specifications.  To the contrary, these counterfeit respirator masks are likely medically inadequate and will not effectively mitigate the transmission of COVID-19.

44.    By branding these counterfeit masks with the BYD trademarks and logos, the counterfeiters confuse and exploit consumers and the public by suggesting to them that the masks are of the quality, safety, and efficacy that the public associates with goods and services trafficked under the BYD mark, and that the masks are genuine respirator masks that are certified and approved by public agencies, including NIOSH. Customers and the general public are likely to be confused by these counterfeiters' use of the BYD and BYD Care trademarks.  The counterfeiters specifically target BYD's customers and BYD's trade channels to increase this confusion.  The respirator masks that the counterfeiters are selling visually appear identical to the masks that BYD sells, and they are affixed with identical trademarks.

45.    The counterfeiters also play off the public's panic and fear in the face of a global pandemic, as consumers are desperate for masks and more susceptible to being scammed.  Through their deception, the counterfeiters profit off of the public's frantic

need for masks by selling uncertified and likely ineffective masks into the stream of commerce.

46.     Although of secondary concern to BYD, the conduct of these counterfeiters also risks damaging the brand of BYD.  Consumers who purchase or otherwise obtain counterfeit BYD masks may not realize the masks are counterfeit, and may conclude that BYD's masks are of poor quality or efficacy, and that they do not meet the NIOSH certifications with which BYD is required to comply.  Not only does this risk degrading and diluting BYD's brand and marks, but it exposes BYD to potential legal liability.

47.     BYD is informed and believes, and on that basis alleges, that the counterfeit BYD N95 respirator masks that Defendants sell and attempt to sell are manufactured and distributed by a single Doe Defendant located in China, or by several Doe Defendants in China acting in concert.  The sheer number of counterfeit masks of which BYD is aware (which is likely far less than the actual number of counterfeit masks), along with the sophistication of the copying technique, belie any notion that these masks are being manufactured by small, independent, outfits.  Rather, the circumstances suggest one or a small number of large Chinese manufacturers producing these counterfeit N95 respirator masks and using distributors in the United States to sell the masks to unwitting consumers.  Moreover, the fact that these counterfeit sellers are specifically targeting BYD's customers suggests coordination with a common source that has knowledge of BYD's customers and distribution channels.

### *Alexander Khazai*

48.     In June 2020, a BYD manager in Mexico was contacted by a concerned potential BYD customer, who reported that he was receiving messages from Defendant Alexander Khazai on the software application WhatsApp.  In these messages, Khazai was offering to sell customers what appeared to be boxes of BYD-branded N95 respirator masks.

49.     In addition to the messages, Khazai sent the customers photographs and videos of the merchandise he was attempting to sell.  Based on the messages,

1   photographs, and videos, it appears that Khazai was in possession of thousands of boxes

2   of N95 respirator masks affixed with the BYD and BYD Care trademarks.  A

3   representative sample of those messages is reproduced below:

4

5

6

7    

8

9

10

11

12

13

14

15    

16

17

18

19

20

21        50.    In addition to including photographs and videos of boxes branded with the

22   BYD and BYD Care trademarks and logos, Khazai made other statements and

23   representations in these messages to suggest to BYD's potential customer that he was in

24   possession of, and was offering to sell, authentic BYD N95 respirator masks.  Khazai

25   included links to news articles describing California's contract with BYD to purchase

26   hundreds of millions of N95 respirator masks, along with documents purporting to be

27   from BYD's manufacturing plant in China representing that the masks are NIOSH

28   certified.  Khazai also included a screenshot of a document purporting to be from the

International Chamber of Commerce purporting to identify Khazai as an "intermediary seller" on behalf of a company MK Global LLC.

51.    The customer receiving these messages, photographs, and videos was confused by the use of the BYD and BYD Care trademarks, and believed that Khazai might be an authorized BYD N95 respirator mask broker and that the masks in the photographs and videos might be authentic BYD products.

52.    In reality, Khazai is not an authorized broker or seller of BYD products, and the boxes in the photographs and videos do not contain authentic BYD N95 respirator masks.  Rather, they are compelling counterfeits.  The boxes are designed to look like authentic BYD N95 mask boxes, and to the untrained eye they are indistinguishable.

53.    BYD is the sole manufacturer and seller of authentic BYD N95 respirator masks in North America.  BYD has not sold masks to Khazai, nor would Khazai have conceivably been able to purchase the amount of masks shown in the photographs and videos on the secondary market.  It is thus apparent that these masks are counterfeit.

54.    Khazai's WhatsApp messages to BYD's potential customer and his use of the BYD and BYD Care trademarks are intended to defraud, mislead and/or deceive a reasonable consumer into believing that he is an authorized broker, seller, or distributor of BYD's products and/or that he is associated or affiliated with BYD, which is not the case.  Khazai does not, and never has, represented BYD, and BYD has never authorized Khazai or any of his affiliates, agents, or employees to manufacture, distribute, advertise, market, offer for sale, receive payments on BYD's behalf, escrow funds on BYD's behalf, and/or sell BYD-branded N95 respirator masks.

55.    Khazai's WhatsApp messages to BYD's potential customer and his use of the BYD and BYD Care trademarks are also intended to defraud, mislead and/or deceive a reasonable consumer into believing that the masks he is offering to sell are authentic BYD N95 respirator masks that were manufactured by BYD.

1

*Aaron Arredondo and James Vaughn*

2     56.     On or around May 21, 2020, a representative of California's Office of

3  Emergency Services ("Cal OES") received an email from an individual identifying

4  himself as James Vaughn.  Cal OES is a state agency in charge of coordinating

5  California's governmental response to disasters, which has played a major role in

6  California's response to the COVID-19 pandemic.  Among other things, the agency is

7  involved in the procurement of N95 respirator masks on behalf of the state, which are

8  then distributed to front-line workers such as healthcare providers and first responders.

9     57.     The email from the individual identifying himself as James Vaughn read:

10  "We have 10 Million NIOSH N95 Masks in the US now available for a spot buy or

11  shipping worldwide. Spec sheets included. Price is $4.25 per mask. MOQ [minimum

12  order quantity] is 1,000,000.  Please let me know your interest."  The referenced "spec

13  sheets" was an attached PDF which included images of BYD's "BYD" and "BYD

14  Care" trademarks and logos, as shown below:

15



16

17

18

19

20

21

22

23

24     58.     The representative from Cal OES who received the email and attached

25  specifications with the BYD and BYD Care marks was confused by the message and by

26  the use of the BYD and BYD Care trademarks, and believed that Vaughn might be an

27  authorized BYD N95 respirator mask broker and that the masks he was offering for

28  purchase might be authentic BYD respirator masks.  The representative from Cal OES

contacted BYD to inform BYD of the email and to ask whether Vaughn was a legitimate broker.  BYD had no record of Vaughn and determined that he was likely selling counterfeit masks.

59.     A representative from BYD elected to call the number that Vaughn had provided to Cal OES in his email to determine more information about Vaughn and counterfeit masks he was selling.  Upon reaching Vaughn, the BYD representative identified himself as a colleague of the Cal OES representative who had received the solicitation email from Vaughn.  The BYD representative requested confirmation that Vaughn "ha[d] 10 million NIOSH N95 masks from BYD that you can sell us," and Vaughn responded in the affirmative.

60.     Vaughn then merged the call with another individual whom Vaughn described as his "supplier."  That supplier identified himself as Aaron Arredondo, and stated that he was based out of Los Angeles and Orange County.  Arredondo represented that he did not work for anyone, and that the masks were being offered through his company Lotus 8 Holdings, which he later stated was a C corporation.  A public records search has indicated no company with a real or fictitious business name of Lotus 8 Holdings registered in the state of California.

61.     The BYD representative then requested more information about the "BYD masks" and asked where they were located and how soon they could deliver the masks.  Arredondo represented that there were 5 million BYD masks that were available for purchase currently located in Los Angeles and that "there will be more behind them."  Arredondo also specifically represented that the masks he was offering for sale were the ones that had been produced by BYD in fulfillment of BYD's contract with the state of California.  The representative from BYD then told Arredondo that he would be in contact with more information about any potential order.

62.     The representations made by Vaughn and Arredondo via email and over the phone were false.  Vaughn and Arredondo are not authorized brokers or sellers of BYD

16
COMPLAINT

products, and therefore do not have authentic BYD N95 respirator masks in their possession.

63.     To the contrary, it is apparent that the masks that Vaughn and Arredondo were offering to sell to Cal OES and the representative from BYD were counterfeits.  As explained above, BYD is the sole manufacturer and seller of authentic BYD N95 respirator masks in North America.  BYD has not sold masks to Vaughn or Arredondo, nor would Vaughn or Arredondo have conceivably been able to purchase from BYD the amount of masks they were offering for sale.

64.     Vaughn's and Arredondo's communications to BYD's customers, including Cal OES, and their use of the BYD and BYD Care trademarks, are intended to defraud, mislead and/or deceive a reasonable consumer into believing that they are an authorized broker, seller, or distributor of BYD's products and/or that they are associated or affiliated with BYD, which is not the case.  Vaughn and Arredondo do not, and never have, represented BYD, and BYD has never authorized Vaughn or Arredondo or any of their affiliates, agents, or employees to manufacture, distribute, advertise, market, offer for sale, receive payments on BYD's behalf, escrow funds on BYD's behalf, and/or sell BYD-branded N95 respirator masks

65.     Vaughn's and Arredondo's email and oral communications to BYD's customers, including Cal OES, and their use of the BYD and BYD Care trademarks, are also intended to defraud, mislead and/or deceive a reasonable consumer into believing that the masks they are offering to sell are authentic BYD N95 respirator masks that were manufactured by BYD.

66.     After BYD became aware that Vaughn and Arredondo were attempting to sell these counterfeit masks, it reported the incident to the FBI's Internet Crime Complaint Center and to the United States Department of Justice.

### *Dripstone LLC*

67.     On May 28, 2020, BYD was informed by a BYD customer Progressive Animal Wellness, a veterinary clinic, that it had ordered and received a shipment of

BYD-branded KN95 respirator masks that it suspected were counterfeit.  The customer attached photographs of the masks, including the images represented below, which demonstrate that the masks were affixed with the BYD trademark and logo.

 

68.     Although the masks that Progressive Animal Wellness received were affixed with the BYD mark, the masks in the photograph appear to be an early version of the KN95 masks that BYD never sold in the United States.  These early KN95 masks were never approved for sale in the United States and do not meet the requisite specifications for sales in the United States.

69.     The representative from Progressive Animal Wellness informed BYD that she had purchased these masks from the website DripstoneLLC.com, which is the website for Dripstone, LLC ("Dripstone").  Dripstone is a California limited liability company that is owned and/or managed by SDS Creative Technologies LLC ("SDS Creative"), which in turn is owned and/or managed by Quasar Capital Ventures.  Quasar Capital Ventures holds itself out as a real estate, venture capital, and financial consulting firm that is led by principal and Chief Investment Officer Steve Shuly Michaels.  Michaels holds himself out as a manager and Chief Financial Officer of SDS Creative and Dripstone.

70.   BYD-branded KN95 masks are still offered for sale on Dripstone's website as of the date of this filing, as shown below:



71.   The representations made by Dripstone on its website pertaining to the nature, quality, and source of the KN95 masks it offers for sale are false.  Dripstone advertises its masks for sale as "BYD KN95 Disposable Particulate Respirator Face Masks."  The masks it offers for sale, and sells, are affixed with the BYD trademark.  Yet Dripstone is not neither affiliated with BYD nor a BYD-approved broker of respirator masks, and the respirator masks it offers for sale, and sells, are not certified or approved for sale in the United States.

72.   Dripstone is not an authorized broker or seller of BYD products.  BYD has never sold KN95 masks to Dripstone or any affiliate entity of Dripstone, nor would Dripstone conceivably been able to purchase the amount of masks they have offered for sale.

73.   Dripstone's marketing and communications to its customers on its website, and its use of the BYD trademarks on the masks it sells, are intended to defraud, mislead and/or deceive a reasonable consumer into believing that Dripstone is an authorized broker, seller, or distributor of BYD's products and/or that it is associated or affiliated with BYD, which is not the case.  Dripstone does not, and never has, represented BYD, and BYD has never authorized Dripstone or any of its affiliates, agents, or employees to manufacture, distribute, advertise, market, offer for sale, receive payments on BYD's behalf, escrow funds on BYD's behalf, and/or sell BYD-branded N95 respirator masks

74.   Dripstone's marketing and communications to its customers on its website, and its use of the BYD trademarks on the masks it sells, are also intended to defraud,

mislead and/or deceive a reasonable consumer into believing that the masks it is offering to sell are certified and approved by the appropriate regulatory bodies for sale in the United States.

### *Roberto Banke*

75. On or around June 16, 2020 a BYD customer forwarded to BYD a video he had received from an individual Roberto Banke. Banke is the owner and chief executive officer of Banke Global Distribution ("Banke Global"). Banke Global holds itself out as a foodservice distributor in Fountain Valley, California.

76. In the video that was sent to certain BYD customers, Banke appears and describes the video as a "proof of life" video.[1] He continues by noting that this particular proof of life video is directed at specific customers or potential customers, including Green Improvement, Tommy Wang, SADA, 1 Kingdom, Keystone Digital Health, and "Jake."

77. In the video, Banke continues: "Here we have our products of the N95 BYD," and the camera then pans to reveal hundreds of boxes containing masks, which are labeled as "N95" and affixed with both the BYD and BYD Care trademark and logos, as shown in the below screenshots from the video. Banke then states on camera that he "ha[s] plenty of inventory left" and "we look forward to doing business with you."

---

[1] A "proof of life" is a common tactic of kidnappers and hostage-takers to prove that their victims are still alive at a given point in time.

 

78.   The customer who received this video was confused by the use of the BYD and BYD Care trademarks in the video, and believed that Banke might be an authorized BYD N95 respirator mask broker and that the masks were authentic.

79.   In reality, neither Banke nor Banke Global is an authorized broker or seller of BYD products, and the boxes shown in the video do not contain authentic BYD N95 respirator masks.  Rather, they are compelling counterfeits.  The boxes are affixed with the BYD and BYD Care trademarks, and are therefore designed to look like the boxes which hold authentic BYD N95 respirator masks.

80.   As noted above, BYD is the sole manufacturer and seller of authentic BYD N95 respirator masks in North America.  BYD has not sold N95 respirator masks to Banke or Banke Global, nor would Banke Global have conceivably been able to purchase the amount of masks shown in the video on the secondary market.  It is thus apparent that these masks are counterfeit.

81.   Banke's video, the statements he makes in that video (including describing the boxes as containing "N95 BYD"), and his reference to boxes which are affixed with the BYD and BYD Care trademarks are intended to defraud, mislead and/or deceive a reasonable consumer into believing that he is an authorized broker, seller, or distributor of BYD's products and/or that he is associated or affiliated with BYD, which is not the case.  Banke and Banke Global do not, and never have, represented BYD, and BYD has never authorized Banke, Banke Global, or any of their affiliates, agents, or employees to

manufacture, distribute, advertise, market, offer for sale, receive payments on BYD's behalf, escrow funds on BYD's behalf, and/or sell BYD-branded N95 respirator masks.

82.   Banke's video, the statements he makes in that video (including describing the boxes as containing "N95 BYD"), and his reference to boxes which are affixed with the BYD and BYD Care trademarks are also intended to defraud, mislead and/or deceive a reasonable consumer into believing that the masks he is offering to sell are authentic BYD N95 respirator masks that were manufactured by BYD.

## FIRST CLAIM FOR RELIEF

*(Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A))*
*(Use of the BYD and BYD Care Marks)*

83.   BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 82 of the Complaint as if set forth fully herein.

84.   Count I is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

85.   Defendants' acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

86.   Defendants' use of Plaintiffs' famous BYD and BYD Care marks to advertise, market, offer for sale, and/or sell purported BYD brand N95 respirator masks to consumers during a global pandemic such as COVID-19 also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).  These counterfeit respirator masks are of dubious quality and efficacy, and expose their users to heightened risk of contraction of COVID-19 than if the masks were actually authentic BYD N95 respirator masks.

87.   Defendants have also falsely held themselves out to be agents of and/or authorized by BYD to sell and/or distribute BYD-branded products, when this is not the case.  Defendants' actions are likely to cause confusion among purchasers and other

members of the relevant public as to the source or sponsorship of the products, and/or as to the nature and quality of such products.

88.    BYD has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  BYD has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

*(Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))*

*(Dilution of the Famous BYD and BYD Care Marks)*

89.    BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 88 of the Complaint as if set forth fully herein.

90.    Count II is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).  The BYD and BYD Care marks were famous before and at the time Defendants began using the BYD and BYD Care marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products.

91.    The BYD and BYD Care marks are famous because they are widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner.  BYD is now the largest manufacturer of respirator masks in the word.  Media outlets have published news stories describing BYD's production of N95 respirator masks and described BYD as a producer and distributor of N95 respirator masks.

92.    Defendants' use of BYD's famous BYD and BYD Care marks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products is likely to dilute the distinctive quality of the famous BYD and BYD Care marks, such that the famous BYD and BYD Care marks' established selling power and value will be whittled away.  This is especially true when Defendants are offering to sell and selling BYD-labeled masks that are not authentic and are not certified to provide the protection of BYD N95 respirator masks.

93.     Defendants' acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

94.     BYD has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by BYD is exacerbated by the fact that Defendants are advertising and offering for sale BYD-branded N95 respirator masks that are counterfeit and of dubious quality, which endangers public health and tarnishes BYD's reputation.  Such conduct has inspired intense public criticism of the manner in which BYD's respirator masks are being distributed and sold during the COVID-19 pandemic and significant confusion about BYD's role in the marketplace for masks that are essential to safeguarding public health.

95.     BYD has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

*(False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))*

*(Defendants' Emails, Text Messages, Websites, and Phone Communications)*

96.     BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 95 of the Complaint as though set forth fully herein.

97.     Count III is a claim for false and deceptive advertising under 15 U.S.C. § 1125(a)(1)(B).

98.     Defendants' various statements described above which were transmitted in emails, WhatsApp messages, websites, and via phone calls to various of BYD's customers constitute commercial advertising and/or commercial promotion.

99.     These statements contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of the products that Defendants allegedly had available for sale.  These deceptive statements included statements that described the masks that Defendants allegedly had available for sale as "BYD masks," "N95 masks," or as affiliated with BYD.  These deceptive statements

also included statements that described the masks as certified by NIOSH.  These statements were all false, misleading, and deceptive.

100.   The false, misleading, and/or deceptive statements made by Defendants were material to the purchasing decisions of the customers who received them.

101.   Defendants placed these statements into interstate commerce by, *inter alia*, sending them to customers located in different states or countries.

102.   Defendants' statements have directly and/or proximately caused and/or are likely to cause BYD to suffer harm in the form of lost sales, as well as irreparable diminution to the BYD brand and BYD's marks' reputation, fame, and goodwill.

103.   Defendants' acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

104.   BYD has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  The damage suffered by BYD is exacerbated by the fact that Defendants are advertising and offering for sale BYD-branded N95 masks that are counterfeit and of dubious quality, which endangers public health.  Such conduct has inspired intense public criticism of the manner in which BYD's respirator masks are being distributed and sold during the COVID-19 pandemic and significant confusion about BYD's role in the marketplace for masks that are essential to safeguarding public health.

105.   BYD has no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF

*(Trademark Dilution, Cal. Bus. Prof. Code §§ 14247)*

*(Dilution of the Famous BYD and BYD Care Marks)*

106.   BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 105 of the Complaint as if set forth fully herein.

107.   Count IV is for trademark dilution under California Business and Professions Code § 14247.

108.   Defendants' acts and conduct complained of herein constitute trademark dilution under California Business and Professions Code § 14247, for the reasons described with respect to the Second Claim for Relief above.

109.   BYD has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  BYD has no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

*(Unfair Competition, Cal. Bus. Prof. Code §§ 17200 et seq.)*

110.   BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 109 of the Complaint as though set forth fully herein.

111.   Count V is for unfair competition in violation of California Business and Professions Code § 17200 *et seq.*

112.   Defendants' unauthorized use in commerce of the BYD and BYD Care marks is likely to cause consumer confusion or mistake or to deceive consumers into believing that Defendants' products and/or services are sponsored by, endorsed by, or originate from BYD or are otherwise connected or affiliated with or approved by BYD, thereby causing loss, damage, and injury to BYD and to the purchasing public, constituting unlawful, unfair, and fraudulent business practices in violation of California Business & Professions Code § 17200 *et seq.*

113.   Defendants' marketing and advertisement of products with the BYD and BYD Care marks was intended to and did mislead customers and consumers to believe that such products were manufactured or distributed by, or authorized for manufacture or distribution by, BYD, in violation of California Business & Professions Code § 17500.

114.   Not only is this conduct deceptive, but it exposes the public to severe risk of harm, as counterfeit and defective masks are inserted into the market, and the public is exposed to increased risk of infection.

115.   This conduct, together with Defendants' other acts alleged herein constitute unfair, unlawful, and fraudulent business acts and practices under California Business and Professions Code § 17200, because such acts are forbidden by various state and federal laws and are unscrupulous, unfair, and injurious to BYD and the public. Defendants' acts have irreparably damaged BYD and the consuming public and will continue to do so unless restrained by this Court.  BYD is without an adequate remedy at law.

116.   As a result of Defendants' wrongful conduct, BYD is entitled to, among other relief, an order enjoining and restraining Defendants from diverting, distributing, and selling the BYD-branded products and restoring to BYD any funds that were wrongfully collected by Defendants so that those funds may be donated to a COVID-19 charitable organization of BYD's choosing.

## SIXTH CLAIM FOR RELIEF

### *(False Advertising, Cal. Bus. Prof. Code §§ 17500 et seq.)*

117.   BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 116 of the Complaint as though set forth fully herein.

118.   Count VI is for false advertising in violation of California Business and Professions Code § 17500 *et seq.*

119.   As alleged herein, Defendants have engaged in and continue to engage in violations of California Business and Professions Code § 17500 by making or disseminating untrue or misleading statements, with the intent to induce the purchase of BYD-branded N95 respirator masks, when Defendants knew or by the exercise of reasonable care should have known the statements were untrue, misleading, and likely to deceive the reasonable consumer and the public.

120.   Defendants engaged in the false and/or misleading advertising and marketing of the BYD-branded N95 respirator masks, as alleged herein, with the intent to directly or indirectly induce consumers to purchase those respirators.

121.   Had Defendants truthfully advertised that they were not authorized to sell BYD-branded products and/or that the products it was selling were not authentic BYD N95 respirator masks, consumers would not have purchased the products or would have purchased a different product from another manufacturer or distributor.

122.   This false and misleading advertising of BYD-branded products by Defendants presents a continuing threat to consumers, as such conduct is ongoing to this day.

123.   As a direct and proximate result of the aforementioned acts and omissions by Defendants, Defendants received and continue to hold monies rightfully belonging to BYD.

## SEVENTH CLAIM FOR RELIEF

*(Unfair Competition and Trademark Infringement under California Common Law)*

124.   BYD repeats and incorporates by reference the statements and allegations in paragraphs 1 – 123 of the Complaint as though set forth fully herein.

125.   Count VII is for unfair competition and trademark infringement under California common law.

126.   Defendants' acts and conduct complained of herein constitute unfair competition and trademark infringement in violation of California common law.

127.   BYD has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.  BYD has no adequate remedy at law

## PRAYER FOR RELIEF

**WHEREFORE**, based on Defendant's conduct complained of, herein, BYD asks this Court:

A. To enter an Order, finding in BYD's favor on each Claim for Relief asserted herein;

COMPLAINT

B. Pursuant to 15 U.S.C. § 1116:

1. To preliminarily and permanently enjoin Defendant, its agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the BYD or BYD Care marks (or any other mark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services;

2. To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing themselves as being distributors, authorized retailers, and/or licensees of BYD and/or any of BYD's products and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, BYD and/or any of its products; and

3.  To order Defendants to file with the Court and serve upon Plaintiffs' counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

C. Pursuant to 15 U.S.C. § 1117:

1. To order Defendants to provide BYD with a full accounting of all manufacture, distribution and sale of products under the BYD and BYD Care marks, as well as all profits derived therefrom;

2. To order Defendants to pay to BYD – so as to be donated charitably – all of Defendants' profits derived from the sale of infringing goods offered under the BYD and BYD Care marks

3. To award BYD – so as to be donated charitably – treble damages in connection with Defendants' infringement of the BYD and BYD Care marks;

4. To find that Defendants' acts and conduct complained of herein render this case "exceptional"; and to award BYD its costs and reasonable attorneys' fees incurred in this matter;

1       D. Pursuant to 15 U.S.C. § 1118, to order the destruction of all unauthorized

2   goods and materials within the possession, custody, and control of Defendants that bear,

3   feature, and/or contain any copy or colorable imitation of BYD's marks;

4       E. To award restitution as authorized by law;

5       F. To award Plaintiffs pre-judgment and post-judgment interest;

6       G. To award Plaintiffs such other relief that the Court deems just and equitable;

7       H. To order that all monetary payments awarded to Plaintiffs be donated to a

8   COVID-19 charitable organization of Plaintiffs' choosing.

9   **JURY DEMAND**

10       Plaintiffs demand a trial by jury.

11

12   Dated:  June 22, 2020          **AKIN GUMP STRAUSS HAUER &**

                           **FELD LLP**

13                              Susan K. Leader

                           Ali R. Rabbani

14                              Joshua A. Rubin

15

16                              By:_____*s/* Susan K. Leader_____

17                                    Susan K. Leader

                            Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28